CLERK'S OFFICE U.S. DIST. COU
AT ROANOKE, VA
FILED

MAY 1 3 2014

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

AMERICAN DEMOLITION AND )
NUCLEAR DECOMMISSIONING, INC., )
)
    Plaintiff, )
) Civil Action No. 3:11CV00078
v. )
) **MEMORANDUM OPINION**
THE IBCS GROUP, INC., )
) By: Hon. Glen E. Conrad
EDMUND C. SCARBOROUGH, and ) Chief United States District Judge
)
STEVEN A. GOLIA, )
)
    Defendants. )

In this diversity action, American Demolition and Nuclear Decommissioning, Inc.

("ADND") asserts a claim for false advertising under Virginia law. The case is presently before

the court on ADND's motion for summary judgment. For the reasons that follow, the motion will

be granted.

## Background

ADND is a New York corporation that provides demolition, decommissioning, and

environmental remediation services. In 2009, the company submitted a bid to perform demolition

work at a nuclear facility in South Carolina known as the Savannah River Site ("SRS"). Because

the nuclear facility is owned by the United States Department of Energy, ADND was required to

furnish a performance and payment bond that complied with the requirements of the Federal

Acquisition Regulations ("FAR").

ADND had previously obtained bonds for construction projects from Edmund C.

Scarborough, an individual surety, and his risk management company, The IBCS Group ("IBCS").

Upon learning of ADND's plans to bid on the SRS project, IBCS's Executive Vice President,

Steven A. Golia, expressed an interest in providing the necessary bond.

During the parties' discussions, William Schaab, the Vice President and Secretary of

ADND, emphasized that ADND needed to procure a bond that would have a high chance of being

approved by the federal government. Golia encouraged Schaab to review a brochure that IBCS

had recently published and posted on its website, which might address Schaab's concerns. The

brochure includes the following representations:

> . . . To back the bond dollar for dollar, some individual sureties, such as
> Scarborough, utilize Irrevocable Trust Receipts ("ITR"), a financial instrument
> widely recognized in the financial world and used by the Government and private
> businesses for a variety of purposes, as their vehicle to pledge the assets to the
> particular bond.
>
> . . .
>
> Individual sureties are specifically recognized by the Federal Acquisition
> Regulation ("FAR"). Properly issued bonds are fully compliant with the FAR. . . .
> Individual surety bonds have been accepted by, among others, the Department of
> Justice, Federal Bureau of Prisons, the General Services Administration,
> Department of the Air Force, Department of Veterans Affairs and Naval Facilities
> Engineering Command.

(Brochure at 3.) The brochure also contains a Question and Answer section, which provides, in

pertinent part, as follows:

> Q. Is your company T-Listed?
>
> A. This means approved by the federal Treasury department on their document
> "Circular 570." For corporate sureties, this is an important part of their
> credentials – the ability to show they are capable of gaining the acceptance
> of the federal government. We are proud of the fact that our bonds have
> been repeatedly accepted by the federal government in multi-million dollar
> amounts. However, since Circular 570 only lists corporate sureties, the
> fact that we are accepted is not shown on this list. If the obligee requires a
> surety good enough to be approved by the federal government, we are!
>
> . . .

2

Q.      What asset backs the bonds?

A.      The bonds may be backed by cash, cash equivalents or readily marketable assets such as commodities.

. . .

Q.      What happens if a bond is rejected by an obligee?

A.      We intend to pre-qualify all bonding requests to minimize the possibility of bond rejection. However, we will reverse a transaction if a bond is promptly rejected.

Id. at 17.

Between September 28, 2008 and March 3, 2009, Golia sent Schaab multiple emails containing a hyperlink to the brochure on the IBCS website. See, e.g., Pl.'s Ex. C-1 ("Our updated brochure is now online! Valuable info about Individual Sureties and details about us: Brochure"). Schaab "read every page of the entire [b]rochure," and "referred to it many times." Schaab Decl. at ¶ 11. Based on the information contained in the brochure, Schaab believed that the individual surety bonds offered by the defendants "would have a high chance of being approved by the federal government because they would be backed by appropriate and FAR compliant assets." Id. at ¶ 14. The brochure also "led [Schaab] to believe that bond premiums would be refunded and that IBCS would 'reverse a transaction' if one of its individual surety bonds was promptly rejected" by the project owner or contracting officer. Id. at ¶ 15.

ADND entered into a General Agreement of Indemnity with Scarborough on March 19, 2009. The General Agreement states that "[t]he full initial fee is fully earned upon execution of the bond and will not be refunded, waived or cancelled for any reason." Agreement at § VI. The General Agreement also states that it "constitutes the entire agreement between the parties," and that "no other separate agreements or understandings, past, present or future, whether oral or written, change the terms of this agreement." Id. at § XX.

3

Several months later, ADND paid the required bond premium in the amount of $138,005.00, and the defendants presented a performance and payment bond to ADND. The bond was issued through "Edmund Scarborough as Individual Surety." Compl. ¶ 29. ADND submitted the bond to the contracting officer for the SRS project and executed a contract for the demolition work. The contracting officer subsequently rejected the bond on the ground that the asset pledged as security was unacceptable under the FAR:

> . . . [A]s to the acceptability of coal as a guarantee for the bond, my interpretation of the FAR is that it is unacceptable. FAR section 28.203-2 states that the Government will only accept (1) cash, (2) readily marketable assets, or (3) irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations. Unacceptable assets include but are not limited to speculative assets (e.g. mineral rights). Here, Edmund Scarborough is offering previously mined coal as an asset. The United States Court of Appeals for the Federal Circuit held in a bid protest case in 2009 that previously mined coal is a speculative asset and the surety in that case was Edmund Scarborough. Additionally, within the last three years, the U.S. Army conducted an investigation into the issuance of possibly fraudulent surety bonds to the United States government by a number of individuals and entities, including Scarborough.

Pl.'s Ex. C-3.

ADND promptly notified IBCS of the contracting officer's decision. The contracting officer gave IBCS approximately five weeks to cure the defect. During that period, IBCS offered the contracting officer a replacement bond from another individual surety, which was allegedly secured by certain real property in Nevada. That bond was also rejected, however, after the contracting officer determined that the real property was actually owned by the United States government rather than the individual surety providing the bond.

On February 22, 2010, the contracting officer advised ADND that the contract for the demolition work would be terminated in three days unless ADND provided verification that it could obtain a bond from a corporate surety listed on the Department of the Treasury's Circular

570.[1]  By email dated February 23, 2010, Golia advised ADND that IBCS could not provide a

bond that satisfied this requirement.  See Pl.'s Ex. C-5 ("[W]e have determined we cannot provide

a T-listed bond at the current time.").

In order to prevent the contracting officer from terminating the contract, ADND

immediately obtained and paid for another bond from a different surety.  That bond was accepted

and approved by the contracting officer.

ADND subsequently requested a refund of the $138,005.00 bond premium paid to IBCS.

After the defendants refused to issue a refund, ADND filed the instant action asserting a claim for

false advertising under Virginia law.

The case is presently before the court on ADND's motion for summary judgment.  The

motion has been fully briefed and the matter is ripe for review.[2]

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In deciding whether to grant a motion for summary judgment, the court

must view the record in the light most favorable to the non-movants, and determine "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 252, 255 (1986).  To withstand a summary judgment motion, the non-movants must

produce sufficient evidence from which a reasonable jury could return a verdict in their favor.  Id.

---

[1] Circular 570, which is "commonly called the 'T-list,'" contains a listing of surety companies
approved by the Treasury Department.  United States v. Stern, 13 F.3d 489, 491 (1st Cir. 1994).

[2] The defendants' two-and-a-half-page brief in opposition was submitted more than a month after
the fourteen-day filing deadline expired.  Nonetheless, the court has considered the arguments set forth
therein in ruling on the instant motion.

at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-movants'] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

## Discussion

Virginia's false advertising statute makes it unlawful for any person, firm, corporation, or association to publish, disseminate, or place before the public a written "advertisement of any sort" that contains "any promise, assertion, representation, or statement of fact which is untrue, deceptive or misleading," if the advertisement is made with the "intent to sell" or "to induce the public" to enter into an obligation. Va. Code § 18.2-216; see also Henry v. R.K. Chevrolet, Inc., 254 S.E.2d 66, 67-68 (Va. 1979) (holding that the statute applies only to "non-oral advertisement[s]"). The statute "also 'subjects the defendant to an action for damages [under Va. Code § 59.1-68.3] by any person who suffers loss as the result' of a statutory violation." Persaud Companies, Inc. v. IBSC Grp., Inc., 425 F. App'x 223, 227 (4th Cir. 2011) (quoting Henry, 254 S.E.2d at 67-68)). For the following reasons, the court concludes that there is no genuine issue of material fact with respect to any of these statutory elements, and that the undisputed facts entitle ADND to judgment as a matter of law.

First, the IBCS marketing brochure plainly constitutes a written "advertisement of any sort" for purposes of § 18.2-216. When faced with the same brochure in Persaud Companies, Inc. v. IBCS Group, Inc., the United States Court of Appeals for the Fourth Circuit held that "the brochure is an advertisement under the statute." Persaud, 425 F. App'x at 227. Although the

6

court declines to hold that relitigation of this issue is barred by the doctrine of collateral estoppel,[3] the court nonetheless concludes, as did the Fourth Circuit, that the marketing brochure satisfies this element of the plaintiff's false advertising claim.

The court also concludes, based on the undisputed evidence in the record, that the defendants publicly disseminated the marketing brochure with the intent to promote the sale of Scarborough's individual surety bonds. It is undisputed that the brochure was posted on IBCS's website for the public to view. Additionally, Golia promoted the brochure in IBCS emails, which contained a hyperlink to the brochure on the company's website. See Pl.'s Ex. C-1 ("Our updated brochure is now online! Valuable info about Individual Sureties and details about us: Brochure").

The court further concludes, as did the Fourth Circuit, that the marketing brochure contains "misleading or deceptive" information regarding IBCS's refund policy. Persaud, 425 F. App'x at 227. Although the brochure indicates that IBCS "will reverse a transaction if a bond is promptly rejected" by the general contractor or project owner, Brochure at 17, the company's actual refund policy, which is set forth in the General Agreement of Indemnity, expressly forbids refunds for any reason. See General Agreement at § VI ("The full initial fee is fully earned upon execution of the bond and will not be refunded, waived or cancelled for any reason.").

---

[3] In Persaud, the Fourth Circuit agreed with the district court that "the brochure is an advertisement" under the false advertising statute, and that the brochure "is -- at a minimum -- misleading or deceptive." Persaud, 425 F. App'x at 227. However, the Fourth Circuit ultimately vacated the district court's grant of summary judgment in favor of the plaintiff, since the district court failed to consider whether the brochure caused any actual injury. Id. Because the Fourth Circuit remanded Persaud for further proceedings and the case was voluntarily dismissed on remand, "there is no . . . final judgment . . . that can be given collateral estoppel effect." Am. Cyanamid Co. v. St. Louis Univ., 5 F. App'x 131, 133 (4th Cir. 2001); see also Sedlack v. Braswell Servs. Grp., 134 F.3d 219, 224 (4th Cir. 1998) ("For collateral estoppel to apply, the proponent must establish that: (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum."); Sullivan v. Easco Corp., 662 F. Supp. 1396, 1408 (D. Md. 1987) (explaining that a stipulation of dismissal with prejudice does not constitute a final judgment on the merits for the purpose of collateral estoppel).

The court likewise concludes that the marketing brochure contains misleading or deceptive statements suggesting that the individual surety bonds issued by Scarborough are backed by FAR-compliant assets. The brochure claims that "[p]roperly issued bonds are fully compliant with the FAR," and that Scarborough's bonds are "backed dollar for dollar with acceptable assets," such as "cash, cash equivalents or readily marketable assets." Brochure at 3, 17; see also 48 C.F.R. § 28.203-2(a) & (b)(1) ("The Government will accept only cash, readily marketable assets, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations. . . . Acceptable assets include -- . . . Cash, or certificates of deposit, or other cash equivalents with a federally insured financial institution . . . . ). However, the individual surety bonds that were actually issued to ADND and other contractors were instead backed by coal, which is deemed "unacceptable" under the FAR. See 48 C.F.R. § 28.203-2(c)(7) ("Unacceptable assets include but are not limited to -- . . . Speculative assets (e.g., mineral rights) . . . ."); see also Tip Top Construction, Inc. v. United States, 563 F.3d 1338, 1344 (Fed. Cir. 2009) (holding, in a case involving another individual surety bond issued by Scarborough, that "the contracting officer correctly concluded that the coal asset pledged in [support of the bond] was not acceptable" under the FAR).

Finally, the court concludes that ADND suffered a loss as a result of the deceptive and misleading statements contained in the marketing brochure. According to William Schaab's sworn declaration, the deceptive and misleading statements in the brochure induced ADND to purchase an individual surety bond from the defendants for the SRS project. The declaration indicates that ADND would not have paid the $138,005.00 bond premium if it had not been induced to believe that the individual surety bond was backed by acceptable assets under the FAR, and that the premium would be refunded in the event that the bond was promptly rejected by the

8

contracting officer. After the bond was rejected and the defendants' efforts to provide a replacement bond proved unsuccessful, the defendants refused to refund the bond premium paid by ADND, and ADND was forced to purchase a bond from a different surety to keep from losing the contract for the demolition work.

The defendants have offered no evidence to refute Schaab's sworn statements regarding ADND's reliance on the information contained in the marketing brochure, or the company's resulting loss in the form of the $138,005.00 "wasted bond premium." Schaab Decl. ¶ 29. Instead, the defendants suggest that summary judgment is inappropriate in this case, merely because the Fourth Circuit vacated the grant of summary judgment on the claim for false advertising in Persaud. See Pl.'s Br. in Opp'n at 3 ("The Court . . . reversed the False Advertising judgment but remanded that claim with instructions to determine if Persaud suffered a loss as a result of the reliance on the false advertising. Thus there are at least causal and factual issues with respect to Plaintiff's reliance and damages."). As noted above, however, the Fourth Circuit's decision on the plaintiff's false advertising claim did not turn on the sufficiency of the plaintiff's evidence with respect to this element. Persaud, 425 F. App'x at 227. Instead, the Fourth Circuit held that the district court erred in failing to consider this element altogether. Id. "Because of this failure," the Fourth Circuit "vacate[d] the grant of summary judgment in favor of [the plaintiff]," and remanded the case to the district court for consideration of "whether [the plaintiff] suffered [a] loss as a result of IBCS's false advertisement." Id. The Fourth Circuit emphasized that if the district court found in favor of the plaintiff on this element, it would be "free to assess appropriate damages." Id.

The defendants' brief in opposition also refers, without explanation, to the portion of the Persaud decision in which the Fourth Circuit ruled that the plaintiff's evidence was insufficient to

9

establish a claim for fraudulent inducement. However, no such claim is asserted in this case, and both the Fourth Circuit and the Virginia Supreme Court have recognized "important distinctions between fraud and false advertising." Persaud, 425 F. App'x at 226-27 (citing Parker-Smith v. Sto Corp., 551 S.E.2d 615, 619 (Va. 2001)). Indeed, the Virginia Supreme Court has held, in light of the "notable differences" between their respective elements of proof, that "the statutory cause of action for false advertising is not properly analogized to a common law cause of action for fraud." Parker-Smith, 551 S.E.2d at 619.

Accordingly, the court agrees with ADND that the Fourth Circuit's rulings in Persaud do not preclude the entry of summary judgment in this case. In the absence of any other meritorious arguments by the defendants or any genuine dispute of material fact, the court concludes that ADND "must prevail as a matter of law" on its claim for false advertising. Anderson, 477 U.S. at 252.

### Conclusion

For the reasons stated, the court will grant ADND's motion for summary judgment and enter judgment in favor of ADND in the amount of $138,005.00, together with post-judgment interest at the rate set forth in 28 U.S.C. § 1961.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 13ᵗʰ day of May, 2014.

_____
Chief United States District Judge

10